**FILED**

**JANUARY 7, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**08 C 107**

| | | |
|---|---|---|
| KEVIN MEMOLI, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | **NO.** |
| Plaintiff, | ) ) ) | **JUDGE KENDALL** **MAGISTRATE JUDGE VALDEZ** |
| vs. | ) ) ) | |
| NAVISTAR INTERNATIONAL CORPORATION, DANIEL C. USTIAN, ROBERT C. LANNERT, MARK T. SCHWETSCHENAU and DELOITTE & TOUCHE LLP, | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiff, Kevin Memoli, ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Navistar International Corp. ("Navistar" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of Navistar's securities between February 14, 2003 and July 17, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Navistar is a holding company that operates through its principal operating subsidiaries, International Truck and Engine Corporation ("International") and Navistar Financial Corporation ("NFC").  The Company operates in four industry segments: Truck, Engine, Parts (collectively called "manufacturing operations") and Financial Services, which consists of NFC and its foreign finance subsidiaries (collectively called "financial services operations").

3.     On December 14, 2005, the Company shocked investors when it postponed an analyst meeting as the audit process for its 2005 Annual Report (ended October 31, 2005) was "taking longer than expected."  Investors were not comforted by the Company's Chief Executive Officer ("CEO") assurance that "as a [C]company, we have high standards."  On this partial disclosure, the Company's shares fell $2.11 per share, or 7 percent, to close on December 14, 2005 at $28.17 per share, on unusually heavy trading volume.

4.     The Company's shares continued to decline as the Company revealed additional information relating to accounting problems.  For instance, on January 17, 2006, the Company stated that it was still "in discussions" with its auditors about "a number of open items" including "complex and technical accounting issues," and that it was unable to determine the impact that the resolution of these issues would have.  The Company cited the fact that "a key member of the Deloitte audit team went on an unexpected, extended medical leave," as contributing to the

delay, but that a "new audit team" was working to complete the Company's fiscal 2005 year-end audit.

5.     On February 21, 2006, the Company disclosed that it might be forced to restate its previously issued financial statements. Specifically, the Company stated that it was reviewing whether it should have capitalized certain leases and consolidated certain affiliates. Additionally, the Company was examining timing issues relating to revenues and expenses.

6.     Then on April 7, 2006, the Company announced that it was restating its financial results for 2002, 2003, 2004, and for the first nine months of 2005. Also, the Company stated that it had "designated" a new independent auditor to replace Deloitte, "whose engagement with the company was terminated by the audit committee." The Company further detailed how the restatements were necessary to remedy prior incorrect accounting for anticipated external funding of product development programs, and the timing of recognition of amounts deemed to be collectible from certain suppliers. Additionally, the Company had incorrectly accounted for warranties to be provided by the company outside of the terms of contractual arrangements, and for the shifting of balances and expense amounts between reporting periods. Further, the Company stated that its review process "continues and will likely result in the identification of additional items requiring correction in the restated results."

7.     On July 17, 2006, Moody's investor service withdrew its rating of the Company, "due to its belief that [Navistar] lacks adequate financial information to maintain a rating." By July 17, 2006, the Company's shares had declined to $20.95 per share.

8.     On February 13, 2007, the Company announced that its stock had been suspended and delisted from the New York Stock Exchange, and that it would start trading on the over-the-counter market (commonly known as the "pink sheets").

9.     Finally, on October 25, 2007, almost two years after Navistar first discovered its accounting problems, the Company disclosed that its restatement adjustments would total $1.12 billion for the restated financial periods, including warranty reserve increases of $321 million. Additionally, the Company recorded $874 million in income tax adjustments.  The Company further revealed that it had identified a number of material weaknesses in its internal controls over financial reporting, which necessitated "a need to establish stronger awareness regarding consistent application of highly ethical standards across all areas of the company, the importance of internal controls over financial reporting and strict adherence to generally accepted accounting principles ('GAAP')."  To address these issues, the Company stated that it had developed "a broad and aggressive plan to reinforce within its culture the importance of ethics, integrity and working in a manner consistent with the company's seven core values, including accountability and communication."  To remedy these failures, the Company hired over 50 additional accounting employees, strengthened its finance and accounting leadership, realigned its finance and accounting reporting structure, and had hired a new vice president of internal audit, a new chief accounting officer and a new chief information officer.  An independent law firm investigating the Company identified instances of intentional misconduct which resulted in the need for restatement adjustments.

10.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.  Specifically, defendants failed to disclose or indicate the following:  (1) that the Company had significantly underreserved for warranty expenses; (2) that the Company had overstated its revenue by understating the level of such warranty reserves; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company lacked

adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

11.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, Navistar's principal executive offices are located within this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, Kevin Memoli, as set forth in the accompanying certification, incorporated by reference herein, purchased Navistar's securities at artificially inflated prices

during the Class Period and has been damaged thereby.

17.    Defendant Navistar is a Delaware corporation with its principal executive offices located at 4201 Winfield Road, Warrenville, Illinois.

18.    Defendant Daniel C. Ustian ("Ustian") was, at relevant times, the Company's President, Chief Executive Officer CEO"), and Chairman of the Board of Directors.

19.    Defendant Robert C. Lannert ("Lannert") was, at relevant times, the Company's Vice Chairman, Chief Financial Officer ("CFO") and a member of the Board of Directors.

20.    Defendant Mark T. Schwetschenau ("Schwetschenau") was, at relevant times, the Company's Senior Vice President and Controller.

21.    Defendants Ustian, Lannert and Schwetschenau are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Navistar's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.    Defendant Deloitte & Touche LLP ("DeLoitte") is a firm of certified public accounts with offices located nationwide, including Chicago, Illinois.    Deloitte audited Navistar's materially false and misleading financial statements for the fiscal years ended October 31, 2003 and 2004, and issued a materially false and misleading opinion on these financial statements.    Additionally, Deloitte consented to the use of its unqualified opinion on Navistar's 2003 and 2004 financial statements in reports filed with the SEC and otherwise disseminated to the investing public during the Class Period.    Deloitte thus participated in the scheme, plan, and common course of conduct as described herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.    Navistar is a holding company that operates through its principal operating subsidiaries, International and NFC.    The Company operates in four industry segments: Truck, Engine, Parts and Financial Services, which consists of NFC and its foreign finance subsidiaries.

### Materially False and Misleading
### Statements Issued During the Class Period

24.    The Class Period begins on February 14, 2003.    On this day, the Company issued a press release entitled "Navistar Loss From Continuing Operations Beats Consensus; Sees Small Second Quarter Loss and Profitability for Full Year."    Therein, the Company, in relevant part, stated:

> **Industry Orders For Medium, Heavy Trucks Up Significantly in January**
>
> **Leading Indicators Appear To Have Stabilized**
>
> Navistar International Corporation (NYSE:NAV), the nation's largest commercial truck and mid-range diesel engine producer, today reported a first quarter loss as was anticipated and while it

forecasts a small second quarter loss, the company reiterated it still expects to be marginally profitable for the full year.

The company, producer of International® brand trucks and diesel engines, said the loss from continuing operations for the quarter ended January 31, 2003, totaled $98 million, or $1.47 per diluted common share, compared with a loss of $53 million, or $0.88 per diluted common share in the first quarter a year ago. The net loss for the quarter, including discontinued operations, amounted to $99 million, or $1.49 per diluted common share. The consensus estimate of security analysts was for a first quarter loss of $1.49 per share.

Consolidated sales and revenues from the company's manufacturing and financial services operations for the first quarter totaled $1.6 billion, compared with $1.5 billion the first quarter of 2002.

Looking ahead, John R. Horne, Navistar chairman and chief executive officer, said a small second quarter loss of 25 cents to 30 cents per diluted share is anticipated if there is a favorable resolution of negotiations with Ford Motor Company in regard to the delay of its V-6 engine program. He emphasized the company should return to profitability in the third and fourth quarters and be profitable for the full year as the result of improved industry demand, increased truck and engine shipments, realization of fixed costs reductions and resolution of the Ford V-6 issues.

\* \* \*

Horne also noted two financing transactions that totaled $365 million were successfully completed during the first quarter. Both financings were well received by the marketplace, demonstrating support for the company's business plans. As a result, absent any extraordinary unforeseen cash demands, the company expects that it will be able to cash flow its business through 2005 even at production volumes as low as 75,000 units.

25.    On May 15, 2003, the Company issued a press release entitled "Navistar Reports Second Quarter, First Half Results; Performance Beats Consensus Estimate of Analysts." Therein, the Company, in relevant part, stated:

**Initiatives To Reduce Costs, Return To Full Year Profitability Progressing Despite Lower Forecast For Industry Class 6-7**

8

Navistar International Corporation (NYSE:NAV), the nation's largest commercial truck and mid-range diesel engine producer, today reported a loss from continuing operations of $12 million, equal to ($0.18) per diluted common share, for the three months ended April 30, 2003, compared with a loss of $2 million or ($0.04) per diluted common share a year earlier. The consensus estimate of security analysts was for a ($0.29) per share loss.

Consolidated sales and revenues from manufacturing and financial services operations for the second quarter of 2003 totaled $1.9 billion, compared with the $1.7 billion reported in the second quarter of 2002.

For the first six months of fiscal 2003, Navistar reported a loss from continuing operations of $110 million, or ($1.64) per diluted common share, compared with a loss of $55 million, or ($0.92) per diluted common share in the first six months of fiscal 2002. Consolidated first half sales and revenues amounted to $3.4 billion, compared with $3.1 billion in the first six months of 2002.

Daniel C. Ustian, Navistar president and chief executive officer, said, "The economic environment during the first half of the company's fiscal year was difficult and uncertain, but we continue to expect an improved market in the second half of the year."

"We still expect a third quarter profit in the range of 20 to 30 cents per share due to increased truck shipments, continued cost reductions and income from financial services," Ustian said. "Assuming that our industry forecast materializes, our goal is for the fourth quarter, historically our best quarter, to bring us to modest profitability for the year. We continue to focus our efforts on reducing our cost structure and returning to profitability."

26.    On August 15, 2003, the Company issued a press release entitled "Navistar Returns to Profitabilty [sic] in Third Quarter as Previously Forecast; Continued Improvements Seen for Fourth Quarter."  Therein, the Company, in relevant part, stated:

**Cost Reduction Remains On Target With Solid Profit Forecast For 2004**

**Substantial Pickup In July Industry Medium Truck Orders**

As it previously forecast, Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck, school bus and mid-range diesel engine producer, today reported

that it returned to profitability in its third fiscal quarter ended July 31, 2003 and said that it is on track to be solidly profitable in the fourth quarter.

Net income from continuing operations for the three months ended July 31, 2003 totaled $19 million, equal to $0.26 per diluted common share, compared with a loss of $16 million or ($0.26) per diluted common share a year ago. The consensus estimate of analysts was a profit of $0.25 cents per share.

Consolidated sales and revenues from manufacturing and financial services operations for the third quarter totaled $1.9 billion, compared with $1.6 billion in the same quarter a year ago.

Daniel C. Ustian, Navistar president and chief executive officer, said that the third quarter profit was achieved despite continued softness in medium truck shipments, but said he was encouraged by strong pickup in new medium truck orders in July.

* * *

"Our focus continues to be on improving our cost structure so that we can be profitable at all points of the business cycle," Ustian said. "We are pleased by the outstanding performances recorded in the third quarter by both our parts and service organization and our finance group. We anticipate we will be solidly profitable in the fourth quarter, with diluted earnings of between $0.65 and $0.75 per share from continuing operations. Despite a strong and profitable second half, based upon our current industry expectations, it will be difficult to overcome the deficit recorded in the first six months of the year."

Turning to the future, Ustian said the company looks for "solid profitability in 2004 as overall economic momentum improves."

Manufacturing gross margins in the third quarter rose to 13.5 percent, up from 12.9 percent in the second quarter and above the 12.2 percent reported in the third quarter last year.

For the first nine months of fiscal 2003, Navistar reported a loss from continuing operations of $91 million, or ($1.35) per diluted common share, compared with a loss of $71 million, or ($1.18) per diluted common share in the first nine months of 2002. Consolidated sales and revenues for the first nine months of fiscal 2003 rose to $5.3 billion from $4.7 billion in the same period in 2002.

27.    On December 2, 2003, the Company issued a press release entitled "Navistar

Reports 4th Quarter Profit as Forecast; Strategies on Track for Solid Profitability in 2004."

Therein, the Company, in relevant part, stated:

**Earnings At Top End of Guidance; Forecasts 16% Improvement In 2004 Industry Demand**

**Company Goal Is To Reach Or Exceed Volume Adjusted 17.5% ROE In 2004**

As previously forecast, Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck and mid-range diesel engine producer, today reported a fourth quarter profit. It marked the company's second consecutive quarter of profitable operations, but the second half profitability wasn't enough to put the company in the black for its full fiscal year ended October 31, 2003.

Earnings from continuing operations for the fourth quarter totaled $77 million, equal to $1.00 per diluted common share. Included in the fourth quarter earnings was an after tax benefit of $22 million, equal to $0.28 per diluted common share resulting from adjustments to previously recorded restructuring charges. Revenues for the fourth quarter of fiscal 2003 amounted to $2.0 billion, approximately the same as revenues in the fourth quarter of fiscal 2002.

Daniel C. Ustian, Navistar president and chief executive officer, said that fourth quarter results reflect improvement in the company's cost structure and, as previously forecast, profit expectations were achieved without the benefit of the credit relating to the company's restructuring initiatives.

A year ago, Navistar reported a fourth quarter loss from continuing operations of $405 million, or ($6.67) per diluted common share, which included after tax restructuring and non-recurring charges of $345 million, or ($5.69) per diluted common share.

"Overall performance for the fourth quarter was excellent and results demonstrated that our strategies are on track for a return to solid profitability in 2004," Ustian said. "It is important to note that earnings from continuing operations on $2.0 billion of revenue was significantly better than in the fourth quarter a year ago."

\* \* \*

Consolidated sales and revenues for the year ended October 31, 2003, totaled $7.3 billion, up from $6.8 billion a year earlier. The

net loss for 2003 amounted to $18 million, equal to ($0.27) per diluted common share, a more than half billion-dollar improvement over the net loss of $536 million, or ($8.88) per diluted common share reported in 2002.

* * *

"We will be profitable in 2004 and our goal is to reach or exceed the volume adjusted 17.5 percent ROE over the business cycle. Using a pro forma equity of $1.358 billion (as of 10/31/02) and our industry projections, that equates to approximately $2.02 per diluted common share" Ustian said. "We demonstrated in the second half of 2003 that we can be profitable at low industry volumes and as demand increases, our earnings will accelerate."

28.    On December 19, 2003, Navistar filed its Annual Report for fiscal year 2003 (ended October 31, 2003) with the SEC on Form 10-K.  The Company's 10-K was signed by the Individual Defendants, and reaffirmed the Company's financial results previously announced on December 2, 2003.  Additionally, the Company, in relevant part, stated:

**Statement of Financial Reporting Responsibility**

***Management of Navistar Financial Corporation and its subsidiaries is responsible for the preparation and for the integrity and objectivity of the accompanying financial statements and other financial information in this report. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America*** and include amounts that are based on management's estimates and judgments.

The accompanying financial statements have been audited by Deloitte & Touche LLP, independent auditors. Management has made available to Deloitte & Touche LLP all the Corporation's financial records and related data, as well as the minutes of Directors' meetings. Management believes that all representations made to Deloitte & Touche LLP during its audit were valid and appropriate.

***Management is responsible for establishing and maintaining a system of internal controls throughout its operations that provides reasonable assurance as to the integrity and reliability of the financial statements***, the protection of assets from unauthorized use and the execution and recording of transactions

in accordance with management's authorization. The system of internal controls, which provides for appropriate division of responsibility, is supported by written policies and procedures that are updated by management as necessary. The system is tested and evaluated regularly by the parent company's internal auditors as well as by the independent auditors in connection with their annual audit of the financial statements. The independent auditors conduct their audit in accordance with auditing standards generally accepted in the United States of America and perform such tests of transactions and balances as they deem necessary. Management considers the recommendations of its internal auditors and independent auditors concerning the Corporation's system of internal controls and takes the necessary actions that are cost-effective in the circumstances to respond appropriately to the recommendations presented. *Management believes that the Corporation's system of internal controls accomplishes the objectives set forth in the first sentence of this paragraph.*

The Audit Committee of the board of directors, composed of six non-employee directors, meets periodically with the independent auditors, management, general counsel and internal auditors to satisfy itself that such persons are properly discharging their responsibilities regarding financial reporting and auditing. In carrying out these responsibilities, the Committee has full access to the independent auditors, internal auditors, general counsel and financial management in scheduled joint sessions or private meetings as in the Committee's judgment seems appropriate. Similarly, the company's independent auditors, internal auditors, general counsel and financial management have full access to the Committee and to the board of directors and each is responsible for bringing before the Committee or its Chair, in a timely manner, any matter deemed appropriate to the discharge of the Committee's responsibility.

\* \* \*

## CONTROLS AND PROCEDURES

### *Evaluation of disclosure controls and procedures*

The company's principal executive officer and principal financial officer, along with other management of the company, evaluated the effectiveness of the company's disclosure controls and procedures (as defined in rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)) as of October 31, 2003. Based on that evaluation, the principal executive officer and principal financial officer of the company

concluded that, as of October 31, 2003, the disclosure controls and procedures in place at the company were (1) designed to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to them to allow timely decisions regarding required disclosure and (2) effective, in that such disclosure controls and procedures provide reasonable assurance that information required to be disclosed by the company, including its consolidated subsidiaries, in reports that the company files or submits under the Exchange Act is recorded, processed, summarized and reported on a timely basis in accordance with applicable rules and regulations. Although the company's principal executive officer and principal financial officer believe the company's existing disclosure controls and procedures are adequate to enable the company to comply with its disclosure obligations, the company has established a disclosure committee that is in the process of formalizing and documenting the controls and procedures already in place.

### Changes in internal controls over financial reporting

The company has not made any change to its internal control over financial reporting (as defined in rule 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal year ended October 31, 2003 that have materially affected, or are reasonably likely to materially affect, the company's internal control over financial reporting.

* * *

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Navistar International Corporation and Consolidated Subsidiaries at October 31, 2003 and 2002, and the results of their operations and their cash flow for each of the three years in the period*

*ended October 31, 2003, in conformity with accounting principles generally accepted in the United States of America.*

Deloitte & Touche LLP

[Emphasis added.]

29.     The Company's 10-K filed on December 19, 2003 also contained Sarbanes-Oxley

required certifications, signed by Defendants Ustian and Lannert, who stated:

I, [Daniel C. Ustian and Robert C. Lannert], certify that:

1.     I have reviewed this annual report on Form 10-K of Navistar International Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

     a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)    Disclosed in this report any change in the registrant's internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

In connection with the Annual Report of Navistar International Corporation (the "Company") on Form 10-K for the period ended October 31, 2003 as filed with the Securities and Exchange Commission (the "SEC") on the date hereof (the "Report"), I, [Daniel C. Ustian, Chief Executive Officer / Robert C. Lannert, Chief Financial Officer] of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

30.    On February 23, 2004, the Company issued a press release entitled "Navistar Reports First Quarter Loss Better Than Guidance; Increases Industry Volume Forecast, Raises

2004 Profit Bar."  Therein, the Company, in relevant part, stated:

> **First Quarter Gross Margin Doubles As Cost, Quality Efforts On Target**
>
> **Board Approves Plans For Development of New Line-Haul Heavy Truck**
>
> Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck, school bus and mid-range diesel engine producer, today reported a smaller-than-expected first quarter loss, raised its fiscal 2004 industry sales forecast and increased its profitability target for the full year.
>
> The company, producer of International(R) brand trucks, diesel engines and IC(R) brand school buses, said the net loss for the quarter ended January 31, 2004, totaled $23 million, or ($0.34) per diluted common share, compared with a loss of $99 million, or ($1.49) per diluted common share in the first quarter a year ago. Navistar had given guidance of a first quarter loss of between ($0.40) and ($0.50) per diluted common share while the mean estimate of ten security analysts was for a first quarter loss of ($0.44) per diluted common share.
>
> "Even after adjusting for the first quarter volume increase, operating income exceeded our expectations," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.
>
> Consolidated sales and revenues from the company's manufacturing and financial services operations for the first quarter totaled $1.9 billion, compared with $1.6 billion in the first quarter of 2003.
>
> * * *
>
> According to Ustian, using the new industry volume forecast, the company's target incentive compensation goal increases to approximately $2.44 per diluted common share in fiscal 2004, compared with the previously announced target earnings goal of $2.02 per diluted common share under the old volume forecast.

31.     On May 20, 2004, the Company issued a press release entitled "Navistar Reports Second Quarter, First Half Profitability; Quarterly Earnings at High End of Company Guidance." Therein, the Company, in relevant part, stated:

**Quality, Cost Reduction, Growth Initiatives Keep Company On Track**

**Class 8 Market Share In Quarter Highest Since 1998**

Navistar International Corporation (NYSE:NAV) today reported it was profitable in the three- and six-month periods ended April 30, 2004, and said its quality improvements and cost reduction initiatives currently under way place the company on track for strong profitability for the full year.

The company said it earned $41 million, equal to $0.54 per diluted common share, in the three months ended April 30, 2004, compared with a net loss of ($14) million, equal to ($0.21) per diluted common share, in the same period a year earlier.

The second quarter 2004 results include a ($0.06) per diluted common share impact from unfavorable foreign exchange, primarily the Canadian dollar. The company previously had indicated that second quarter earnings would be in the range of $0.45 to $0.55 per diluted common share. Consolidated sales and revenues from manufacturing and financial services operations for the second quarter of 2004 totaled $2.3 billion, compared with the $1.9 billion reported in the second quarter of 2003.

For the first six months of fiscal 2004, Navistar reported net income of $18 million, equal to $0.25 per diluted common share, compared with a loss of ($113) million, or ($1.68) per diluted common share, in the first six months a year ago. Consolidated first-half sales and revenues amounted to $4.2 billion, compared with $3.4 billion in the first six months of 2003.

Daniel C. Ustian, Navistar chairman, president and chief executive officer, said the recent economic improvement and upsurge in new truck orders is consistent with what the company said in February when it raised its industry retail sales volume 8 percent. He reaffirmed the outlook that a total of 328,500 Class 6-8 trucks and school buses will be sold in the United States and Canada in the fiscal year ending October 31, 2004.

Ustian said the company will reassess this forecast as the year develops. He also said that the company anticipates earnings for the quarter ending July 31, 2004, to be in the range of $0.60 to $0.70 per diluted common share.

\* \* \*

"Our return to profitability is just the start of where we intend to go as we continue our journey to become a $15 billion company through the introduction of new products in our current markets, as well as by finding new business opportunities in similar markets," Ustian said. "We believe we are well positioned to increase our annual profitability at a more rapid rate than our increase in sales."

32.     On August 19, 2004, the Company issued a press release entitled "Navistar Third Quarter Per Share Earnings Meet Guidance; Continued Improvements Seen for Fourth Quarter; Focus On Cost Reductions Continues; Solid Future Profit Opportunities Forecast."  Therein, the Company, in relevant part, stated:

Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck, school bus and mid-range diesel engine producer, today reported substantially improved earnings for its third fiscal quarter and said that based on the current outlook, earnings for the fiscal year ending October 31, 2004, are on track to meet or exceed $2.95 per diluted common share.

Net income for the three months ended July 31, 2004, totaled $56 million, equal to $0.73 per diluted common share, compared with $18 million or $0.25 per diluted common share a year ago. The company had previously forecast that earnings for the third quarter would be in the range of $0.60 to $0.70 per diluted common share.

Third quarter net income includes a benefit from an adjustment to a previously recorded restructuring charge. Consolidated sales and revenues from manufacturing and financial services operations for the third quarter totaled $2.4 billion, compared with $1.9 billion in the same quarter a year ago.

* * *

Net income for the first nine months of fiscal 2004 totaled $88 million, or $1.19 per diluted common share, compared with a net loss of $95 million, or ($1.41) per diluted common share in the first nine months of 2003. Consolidated sales and revenues for the first nine months of fiscal 2004 rose to $6.6 billion from $5.3 billion in the same period in 2003.

Based on the current outlook, Ustian forecast that earnings for the fiscal year ending October 31, 2004, should be $2.95 or more per

diluted common share, compared with a loss of ($0.27) per diluted common share in fiscal 2003.

"Our ability to mitigate the impact of current economic challenges, principally the impact of the current steel situation and the fact that all truck manufacturers now are on allocation of 15-liter engines from Caterpillar and Cummins, will dictate how high earnings will rise this fiscal year," Ustian said. "More important, we are on a path of completing significant changes to the company that should provide solid earnings growth opportunities in 2005 and beyond."

33.    On February 15, 2005, the Company issued a press release entitled "Navistar Reports Record 4th Quarter Profits; $3.20 EPS for 2004 Exceeds Preliminary Figure Announced in December."  Therein, the Company, in relevant part, stated:

Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck and mid-range diesel engine producer, today reported that fourth quarter earnings totaled $159 million, equal to $2.02 per diluted common share. Consolidated sales and revenues for the quarter rose to $3.1 billion, from a restated $2.1 billion a year earlier.

In the fourth quarter a year ago, the company earned a restated $36 million or $0.49 per diluted common share, which included a benefit of $22 million, equal to $0.28 per diluted common share from adjustment of restructuring charges.

The preliminary results were announced in December 2004. At that time, the company said earnings for the fourth quarter were expected to be at least $148 million, equal to $1.88 per diluted common share. Earnings for the full year were expected to be to at least $236 million, or $3.07 per diluted common share.

Both fourth quarter and full year earnings and sales and revenues figures exceeded the preliminary figures released in December 2004.

The company filed its Form 10-K for the fiscal year ended October 31, 2004 today. The document presented restated financial statements for the fiscal years of 2002 and 2003 and restated financial information for the first three quarters of 2004. The restatement reflects adjustments primarily related to accounting for the securitization of assets at the company's finance subsidiary and the consolidation of company-owned dealer organizations. A more detailed description of the restatement can be found in Navistar's

Form 10-K that was filed today with the Securities and Exchange Commission and can be found at the company's website at http://www.nav-international.com.

Earnings for the full fiscal year ended October 31, 2004 totaled $247 million, or $3.20 per diluted common share, compared with a restated net loss of $21 million, equal to ($0.31) per diluted common share in fiscal 2003.

Sales and revenues for the year ended October 31, 2004, rose to $9.7 billion from a restated $7.6 billion a year earlier, marking the first time in the company's history that sales and revenues topped $9 billion.

Because of the restatement process, the filing of the company's Form 10-K was delayed and the company will also delay the announcement of its first quarter results until mid-March.

34.    Also on February 15, 2005, Navistar filed its Annual Report for fiscal year 2004 (ended October 31, 2004) with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, and reaffirmed the Company's financial results previously announced. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 28, *supra*. Additionally, the Company, in relevant part, stated:

> **Management of Navistar International Corporation and its subsidiaries is responsible for the preparation and for the integrity and objectivity of the accompanying financial statements and other financial information in this report. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and include amounts that are based on management's estimates and judgments.**
>
> The accompanying financial statements have been audited by Deloitte & Touche LLP, an independent registered public accounting firm. Management has made available to Deloitte & Touche LLP all the company's financial records and related data, as well as the minutes of the board of directors' meetings. Management believes that all representations made to Deloitte & Touche LLP during its audit were valid and appropriate.
>
> **Management is responsible for establishing and maintaining a system of internal controls throughout its operations that**

*provides reasonable assurance as to the integrity and reliability of the financial statements*, the protection of assets from unauthorized use and the execution and recording of transactions in accordance with management's authorization. The company's system of internal controls, which provides for appropriate division of responsibility, is supported by written policies and procedures that are updated by management, as necessary. *Management is responsible for the periodic evaluation of the system of internal controls. The system is tested and evaluated regularly by the company's internal auditors as well as by the independent registered public accounting firm in connection with its annual audit of the financial statements.* The independent registered public accounting firm conducts its audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) and perform such tests of transactions and balances as they deem necessary. The company's system of internal controls is improved or modified, in a manner that is cost-effective in the circumstances, in response to changes in business conditions and operations and recommendations made by internal auditors and independent registered public accounting firm.

The Audit Committee of the board of directors, composed of six non-employee directors, meets periodically with the independent registered public accounting firm, management, general counsel and internal auditors to satisfy itself that such persons are properly discharging their responsibilities regarding financial reporting and auditing. In carrying out these responsibilities, the Committee has full access to the independent registered public accounting firm, internal auditors, general counsel and financial management in scheduled joint sessions or private meetings as in the Committee's judgment seems appropriate. Similarly, the company's independent registered public accounting firm, internal auditors, general counsel and financial management have full access to the Committee and to the board of directors and each is responsible for bringing before the Committee or its Chair, in a timely manner, any matter deemed appropriate to the discharge of the Committee's responsibility.

* * *

## RESTATEMENT OF PRIOR PERIOD FINANCIAL STATEMENTS

In December 2004, NFC determined that it would restate its consolidated financial statements for the first three quarters of fiscal 2004 and the fiscal years ended October 31, 2003 and 2002 due to certain misapplications of GAAP. The primary area where it

was determined that GAAP was incorrectly applied was in the accounting for retail note securitizations. As a result of NFC's restatement, the company concluded that it was necessary to restate its financial statements for the same periods. In the course of preparing the restatement of its consolidated financial statements, the company determined that it was appropriate to make other adjustments as well. The following sections describe the restatement matters in more detail.

* * *

## CONTROLS AND PROCEDURES

### *Evaluation of disclosure controls and procedures*

The company's principal executive officer and principal financial officer, along with other management of the company, evaluated the effectiveness of the company's disclosure controls and procedures (as defined in rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)) as of October 31, 2004. Based on that evaluation, the principal executive officer and principal financial officer of the company concluded that, as of October 31, 2004, there were weaknesses in the disclosure controls and procedures within the company's finance subsidiary. The weaknesses resulted in a misapplication of GAAP related to securitization accounting. The company's finance subsidiary restated its previously issued financial statements to correct the misapplication. Because of the weakness noted within the finance subsidiary, the principal executive officer and principal financial officer of the company concluded that the disclosure controls and procedures in place at the company were not effective. Management has strengthened, as of October 31, 2004, its controls and procedures over the application of these accounting standards and believes that the circumstances resulting in the misapplication of GAAP will not reoccur.

### *Changes in internal controls over financial reporting*

The company has not made any changes to its internal control over financial reporting (as defined in rule 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal year ended October 31, 2004 that have materially affected, or are reasonably likely to materially affect, the company's internal control over financial reporting except for:

(1)    the actions taken by the company's financial services subsidiary to correct the accounting associated with its retail note securitization program;

(2)    a reemphasis of reconciliation controls, relative to accounts payable, at the company's Mexican truck assembly facility;

(3)    the commencement of the consolidation of majority owned dealerships.

* * *

We have audited the Statement of Financial Condition of Navistar International Corporation and Consolidated Subsidiaries as of October 31, 2004 and 2003, and the related Statements of Income, Comprehensive Income and Cash Flow for each of the three years in the period ended October 31, 2004. These consolidated financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Navistar International Corporation and Consolidated Subsidiaries at October 31, 2004 and 2003, and the results of their operations and their cash flow for each of the three years in the period ended October 31, 2004, in conformity with accounting principles generally accepted in the United States of America.***

As discussed in Note 23 to the consolidated financial statements, the accompanying 2003 and 2002 financial statements have been restated.

Deloitte & Touche LLP

[Emphasis added.]

35.   On April 14, 2005, the Company issued a press release entitled "Navistar Reports First Quarter Results; Exceeds Guidance."  Therein, the Company, in relevant part, stated:

> Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck, school bus and mid-range diesel engine producer, today reported that it earned $20 million, equal to $0.27 per diluted common share, in its first fiscal quarter compared with a net loss of $14 million or ($0.20) per diluted common share in the first quarter a year ago. The company had previously forecast that first quarter profits would be between $0.20 and $0.25 per diluted common share.
>
> Consolidated sales and revenues from the company's manufacturing and financial services operations for the first quarter ended January 31, 2005 totaled $2.6 billion, compared with a restated $1.9 billion in the first quarter of 2004.
>
> Daniel C. Ustian, Navistar chairman, president and chief executive officer, said first quarter results reflect volume improvements tied to strong industry demand and substantially higher heavy truck market share than in the first quarter of 2004.
>
> "We are nearing the end of our second fiscal quarter and industry demand continues strong and our heavy truck market share continues at a high level," Ustian said
>
> Ustian reiterated that based on the company's current truck industry volume forecast of 389,500 units, earnings in 2005 should be in the range of at least $4.60 to $5.00 per diluted common share. He said that industry volume is ahead of the company's forecast and that the forecast and guidance will be reviewed and commented upon during the second quarter conference call.

36.   On April 25, 2005, the Company issued a press release entitled "Navistar Adjusts Previously Reported First Quarter Net Income; Full Year Guidance Remains Unchanged at $4.60 to $5.00 Per Share."  Therein, the Company, in relevant part, stated:

> Navistar International Corporation (NYSE:NAV) announced today that earnings for the three months ended January 31, 2005, totaled $18 million, equal to $0.24 per diluted common share versus the

previously announced $20 million, or $0.27 per diluted common share.

Based upon further review, which was completed as the company was preparing its Form 10-Q, it was determined that the previously discussed one-time charges related to the company's engine foundry operations needed to be adjusted from $8 million to $12 million. The company is filing its Form 10-Q today with the Securities and Exchange Commission.

The company said that the adjusted first quarter results do not change its full year per share earnings guidance of at least $4.60 to $5.00 per diluted common share.

37.    Also on April 25, 2005, Navistar filed its Quarterly Report with the SEC on Form 10-Q.   The Company's 10-Q was signed by Defendant Schwetschenau, and reaffirmed the Company's financial results previously announced.   The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 28, *supra*.

38.    On June 9, 2005, the Company issued a press release entitled "Navistar Reports Second Quarter Earnings at High End of Guidance; Accelerated Earnings Gains Seen for Fourth Quarter."   Therein, the Company, in relevant part, stated:

**Class 8 Market Share Continues To Improve, Initiatives Keep Company On Growth Track**

Navistar International Corporation (NYSE:NAV) today reported strong revenues for the three months ended April 30, 2005, driven by favorable market conditions.

The company said it earned $53 million, equal to $0.70 per diluted common share, for the three months ended April 30, 2005, compared with $52 million, equal to $0.68 per diluted common share, in the same period a year earlier. Previously, the company indicated that second quarter earnings would be in the range of $0.65 to $0.70 per diluted common share.

Consolidated sales and revenues from manufacturing and financial services operations for the second quarter of 2005 totaled $3.0

billion, compared with the $2.4 billion reported in the second quarter of 2004.

For the first six months of fiscal 2005, Navistar reported net income of $71 million, equal to $0.95 per diluted common share, compared with $38 million, or $0.52 per diluted common share, in the first six months a year ago. Consolidated first-half sales and revenues amounted to $5.5 billion, compared with $4.3 billion in the first six months of 2004.

Daniel C. Ustian, Navistar chairman, president and chief executive officer, said the second quarter results reflect improved operating results from the company's truck group, which benefited from a continued favorable economic environment driving demand for commercial trucks.

* * *

Ustian said that earnings per share for fiscal 2005 are expected to be in the range of $4.80 to $5.10 per diluted common share, up from previous guidance of $4.60 to $5.00 per diluted share. He also said that the company anticipates earnings for the third quarter ending July 31, 2005, to be in the range of $0.75 to $0.85 per diluted common share. Revenues for the full year should be in the range of $11.4 billion to $11.7 billion, up from the $9.7 billion reported in 2004.

39.     Also on June 9, 2005, Navistar filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q reaffirmed Navistar's previously announced financial results, and contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 28, *supra*.

40.     On September 7, 2005, the Company issued a press release entitled "Navistar Reports Strong Third Quarter, Nine Month Results; Quarterly net income increases 28% while sales and revenues up 27%." Therein, the Company, in relevant part, stated:

Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck, school bus and mid-range diesel engine producer, today reported improved earnings for its third fiscal quarter ended July 31, 2005.

Net income in the third quarter increased 28 percent to $64 million, equal to $0.83 per diluted common share, from $50 million, or $0.66 per diluted common share, in the same period a year earlier. Consolidated sales and revenues from manufacturing and financial services operations for the third quarter of 2005 increased 27 percent to $3.0 billion from $2.3 billion in the third quarter of 2004.

For the first nine months of fiscal 2005, Navistar reported net income of $135 million, equal to $1.78 per diluted common share, up 53 percent from the $88 million, or $1.19 per diluted common share, reported in the first nine months of fiscal 2004. Consolidated sales and revenues were up 28 percent to $8.5 billion from $6.6 billion in the first nine months of 2004.

41. On September 9, 2005, Navistar filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendant Schwetschenau, and reaffirmed the Company's financial results previously announced on September 7, 2005. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 28, *supra*.

42. The statements contained in ¶¶ 24 – 41 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had significantly underreserved for warranty expenses; (2) that the Company had overstated its revenue by understating the level of such warranty reserves; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

43. On December 14, 2005, the Company issued a press release entitled "Navistar Postpones New York Analyst Meeting." Therein, the Company, in relevant part, stated:

Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck and mid-range diesel engine

28

producer, today postponed a scheduled meeting with security analysts and shareowners because the company's external audit for Fiscal 2005 is still in progress.

*"As a company, we have high standards and our audit process is taking longer than expected," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "We intend for this meeting to take place at the first opportunity when we are able to provide complete Fiscal 2005 results and 2006 guidance."*

Financial results for 2005 will be announced upon completion of the company's external audit and a Form 10-K is anticipated to be filed on time in January. [Emphasis added.]

44.    On this partial disclosure, the Company's shares fell $2.11 per share, or 7 percent, to close on December 14, 2005 at $28.17 per share, on unusually heavy trading volume.

45.    On January 17, 2006, the Company issued a press release entitled "Navistar International Corporation to Delay Filing Form 10-K." Therein, the Company, in relevant part, further revealed:

Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck and mid-range diesel engine producer, announced today that it will not file its Form 10-K for the fiscal year ended October 31, 2005, by its January 17 filing deadline *because it is still in discussions with its outside auditors about a number of open items*.

Because there has been no determination when the ongoing discussions with Deloitte and Touche LLP will be concluded, *the company said it cannot determine when it will be able to file its Form 10-K. The company and Deloitte are reviewing a number of open items including some complex and technical accounting issues and the company cannot determine the impact the resolution of these issues may have, if any, on the per share earnings guidance issued last September.* The company's Form 10-K for fiscal 2005 will be filed with the Securities and Exchange Commission as soon as practical.

*In mid December 2005, a key member of the Deloitte audit team went on an unexpected, extended medical leave. A new audit team from Deloitte is now working to complete the year-end audit for fiscal 2005.*

* * *

Since the company's 2005 Form 10-K has been delayed, the company may be delayed in announcing financial results for its first fiscal quarter ending January 31, 2006. The company also stated that it will postpone its annual meeting of shareowners, previously scheduled for February 21, 2006, to a later date to be announced.

The company believes the delay in filing the Form 10-K should not result in any adverse action against the company by its lenders, even though the delay will result in the company being unable to comply promptly with requirements in various debt agreements and financial arrangements for delivery of year-end financial statements.

While the company said it will not issue specific earnings guidance for 2006 at this time, it said that based on the current industry outlook, it expects that earnings per share will be higher than the current average estimate of Wall Street security analysts of $5.34 per share.

* * *

Robert C. Lannert, Navistar vice chairman and chief financial officer, is working closely with Bill Caton, executive vice president of finance, in completing the year-end audit. As previously announced, Caton will succeed Lannert as chief financial officer upon filing of the company's Form 10-K. Lannert has been undergoing cancer treatments in recent months and is making excellent progress in his recovery. [Emphasis added.]

46.    On February 16, 2006, Navistar issued a press release entitled "Navistar Reports Continuing Progress on Completion of 2005 Financial Statements; Controller And Principal Accounting Officer Reassigned."  Therein, the Company, in relevant part, further revealed:

Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck and mid-range diesel engine producer, reported today that progress is being made on the completion of its Form 10-K for the fiscal year ended October 31, 2005.

*"We are committed to taking positive actions that move toward resolution of the complex and technical accounting items that*

*are under review," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.*

Ustian said the company is fortunate to have two senior finance executives who will lead the efforts. ***Bill Caton, executive vice president of finance, who joined the company last October and has extensive experience in dealing with complex and technical issues, will take the lead in the working to complete the review of the accounting issues. Robert Lannert, the company's chief financial officer, will continue to provide financial leadership to the company during this transition period.***

***To facilitate the completion of the audit, Mark T. Schwetschenau, the company's senior vice president and controller, has been reassigned to another position within the company. Schwetschenau was the company's principal accounting officer.*** [Emphasis added.]

47.     On February 21, 2006, Navistar issued a press release entitled "Navistar Launches Cash Tender Offers and Consent Solicitations for Certain Outstanding Debt; Company Also Provides Update on Accounting Review."  Therein, the Company, in relevant part, further revealed:

Navistar announced on January 17th that it would not file its Annual Report on Form 10-K for fiscal year ended 2005 by the filing deadline because of an ongoing review of a number of complex and technical accounting items. ***Navistar continues to work toward a resolution of these items and progress is being made. The company's review of the accounting matters may result in changes to its previously issued financial statements, including the possibility of a restatement.*** In light of the accounting review, Navistar is not able to give earnings guidance for fiscal year 2005. ***Among the items being reviewed are whether certain leases should have been capitalized rather than accounted for as operating leases, whether certain affiliates should have been consolidated rather than reported on the equity method, and certain timing adjustments that would shift revenue and expense amounts between reporting periods. Matters identified at this stage are necessarily preliminary and subject to change. To assist in the ongoing efforts to complete the review of the company's financial statements, the company has retained external consultants, including Huron Consulting Group and Skadden, Arps, Slate, Meagher & Flom, LLP.*** [Emphasis added.]

48.     On April 7, 2006, Navistar issued a press release entitled "Navistar to Restate Financial Results for Years 2002 to 2005; Announces Change in Independent Auditors; Business Continues Strong With Record March Heavy Truck Orders; March Medium Orders Highest In 30 Years."  Therein, the Company, in relevant part, further revealed:

> Navistar International Corporation (NYSE:NAV), the nation's largest combined commercial truck and mid-range diesel engine producer, announced today that *it will restate its financial results for the fiscal years 2002 through 2004 and for the first nine months of fiscal 2005*.
>
> *The company also said that the audit committee of its board of directors has designated KPMG LLP as the company's new independent auditor, subject to KPMG's customary client acceptance procedures, to replace Deloitte & Touche LLP, whose engagement with the company was terminated by the audit committee.* KPMG will opine on the 2005 Form 10-K as well as the prior years restatements.
>
> *The need for the restatements has been identified in the ongoing review of accounting matters that have prevented the company from filing its fiscal 2005 annual report on Form 10-K and its first quarter 2006 quarterly report on Form 10-Q on time. With the change of independent auditors the timing of the filing of the 2005 Form 10-K, including the prior periods on a restated basis, cannot be determined at this time.*
>
> *According to Bill Caton, Navistar's executive vice president, finance, to date, the company has identified items requiring restatement to include accounting for anticipated external funding of product development programs; timing of recognition of amounts deemed to be collectible from certain suppliers, including rebates and warranty recoveries; accounting for warranty to be provided by the company outside of the terms of the contractual arrangements; and shifting balances and expense amounts between reporting periods at one of the company's foundry operations. The company's review process continues and will likely result in the identification of additional items requiring correction in the restated results.*
>
> * * *
>
> The company also announced that James A. Blanda is joining Navistar as interim corporate controller, subject to formal board

approval later this month. Blanda currently is a partner with Tatum LLC, an interim executive services and consulting firm. Prior to that, Blanda was senior vice president, financial services and chief financial officer for the Chicago Stock Exchange from 1998 to 2004 and vice president and controller for Sears, Roebuck and Co. from 1992 to 1998. [Emphasis added.]

49.    On July 17, 2006, Moody's issued a press release entitled "Moody's Withdraws Navistar's Ratings." Therein, the Company, in relevant part, further revealed:

New York, July 17, 2006 -- Moody's Investors Service withdrew its ratings of Navistar International Corporation (B1 senior unsecured and B3 subordinate) due to its belief that it lacks adequate financial information to maintain a rating. Please refer to Moody's Withdrawal Policy on moodys.com.

Navistar has been unable to file Form 10K for its fiscal year ending October 31, 2005. In addition, on April 6th the company announced that it had concluded that its financial statements for the years ended October 31, 2002 through 2004, and all quarterly financial statements for periods after November 1, 2002, should not be relied upon because of errors in these financial statements.

50.    By July 17, 2006, the Company's shares had declined to $20.95 per share.

### Post Class Period Developments

51.    On September 5, 2006, Navistar issued a press release entitled "Bill Caton Elected CFO at Navistar International Corporation." Therein, the Company, in relevant part, further revealed:

Bill Caton has been elected executive vice president and chief financial officer of Navistar International Corporation (NYSE:NAV), it was announced today.

***Caton, who joined Navistar last October as executive vice president, finance, succeeds Robert C. Lannert, who will now focus on future strategic initiatives.*** [Emphasis added.]

52.    On February 13, 2007, Navistar issued a press release entitled "Navistar Begins Trading on Pink Sheets." Therein, the Company, in relevant part, further revealed:

Navistar International Corporation will begin trading tomorrow on the over-the-counter market commonly known as the "pink sheets" under the symbol NAVZ following its suspension from the New York Stock Exchange at the end of trading today. The company's preferred stock will trade under the symbol NAVZP.

Trading on the pink sheets will continue while Navistar pursues the appeal it announced last week of the New York Stock Exchange decision to suspend trading and delist the company because the company's completion of the restatement of its fiscal 2005 financial statements will extend beyond the suspension date.

53.    On October 25, 2007, Navistar issued a press release entitled "Navistar Releases Unaudited Restated 2003-2005 Financial Data; Reaffirms 2009 Revenue Growth and Margin Targets."  Therein, the Company, in relevant part, further revealed:

- **Management Reaffirms 2009 Targets: Greater Than $15 Billion Revenue with $1.5 Billion Pro Forma Segment Margin;**

- **Actions Being Taken to Strengthen Internal Control Environment;**

- **Third Quarter 2007 Operating Metrics Reported;**

- **Military Orders and Other Non-Traditional Business Drive Growth;**

- **Navistar in Discussion with General Motors to Acquire GM's Medium Truck Business.**

Navistar International Corp. (Other OTC:NAVZ) today released summary preliminary and unaudited results for fiscal years ended October 31, 2003, 2004 and 2005, marking progress toward becoming a current filer with the Securities and Exchange Commission (SEC). Navistar's senior management also provided the company's third quarter 2007 operating metrics and reaffirmed its commitment to 2009 growth and pro forma segment margin targets.

"We've reached the point in our restatement process where we can review many of our key financial indicators with investors and analysts," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "This is a significant milestone toward becoming current in our SEC filings and toward the relisting of our

stock on a major exchange. We are committed to thorough and accurate financial reporting for our shareholders and investment community and to guide our business decisions."

* * *

*The company's pre-tax restatement adjustments total negative $1.12 billion during the restatement period of 2003 and prior, 2004 and the first three quarters of 2005. In addition, the company recorded $874 million in income tax adjustments, including a full valuation allowance for deferred tax assets. (Condensed unaudited financial information is attached to this news release.)*

*Included in the $1.12 billion are warranty reserve increases of $321 million, representing the largest change to operational results.* During an investor and analyst meeting today, Ustian detailed recent warranty performance improvements and committed to report the company's warranty expense progress on a quarterly basis.

"The fundamentals of our business have grown stronger throughout the restatement process," Ustian said. "We've developed exciting new products with high-quality launches, maintained strong dealer relationships and expanded our reach into non-traditional areas including military and export markets."

### Navistar Strengthens Financial Control Environment

*Management has assessed the effectiveness of Navistar's internal controls over financial reporting and identified a number of material weaknesses. This assessment determined a need to establish stronger awareness regarding consistent application of highly ethical standards across all areas of the company, the importance of internal controls over financial reporting and strict adherence to generally accepted accounting principles (GAAP).* To address these issues, the company has developed a broad and aggressive plan to reinforce within its culture *the importance of ethics, integrity and working in a manner consistent with the company's seven core values, including accountability and communication*.

"Our leadership team is committed to strengthening our control environment and reemphasizing *the importance of operating within our values and guiding behaviors, which are grounded in simply doing the right thing," Ustian said. "We are actively*

*engaged in implementing comprehensive remediation efforts to address these control deficiencies."*

"We are continuing to strengthen our company's financial reporting and internal control environment," said Bill Caton, executive vice president and chief financial officer. "Navistar's reputation is one of its greatest assets and is the basis upon which we build the trust of our shareholders, our customers, our business partners and our employees. We have taken *significant measures to rebuild an effective internal control environment, and we expect to continue to aggressively invest in this area in the coming years*."

*Among actions taken to strengthen its financial processes, the company has hired more than 50 additional accounting employees; strengthened its finance and accounting leadership; realigned its finance and accounting reporting structure; and hired a new vice president of internal audit, a new chief accounting officer and a new chief information officer. Additionally, Navistar has enhanced company-wide communication regarding the importance of accurate financial reporting and a robust control environment.*

In addition to management's own assessment, a thorough investigation has been conducted by an independent law firm. Initiated by an independent committee of Navistar's board of directors, *the investigation echoed the findings of management regarding the internal control environment and determined that most of the errors corrected in the restatement were due to lack of proper accounting knowledge, which resulted in the misapplication of GAAP. The independent investigation also identified instances of intentional misconduct that resulted in some of the company's smaller, but in some cases material, restatement adjustments. Most of the individuals who were involved in instances of misconduct are no longer employed by the company. In other instances, the independent committee of the board has implemented appropriate remediation plans.* [Emphasis added.]

54.    Finally, on October 29, 2007, Navistar filed an 8-K Current Report with the SEC,

which in relevant part stated:

Navistar International Corporation's (the company) former Vice Chairman and Chief Financial Officer, Robert C. Lannert's employment with the company has been terminated effective October 31, 2007.

Mr. Lannert, 67, had served as the company's CFO until October 2006 and subsequently served in a senior advising role.

## NAVISTAR'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## <u>FILED WITH THE SEC</u>

55.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

56.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

57.    The fact that Navistar will restate its financial statements, and disclosed that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, ¶¶7-13; SFAS No. 154, ¶25).

58.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial

statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents

underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

59.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Navistar's securities between February 14, 2003 and July 17, 2006, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Navistar's securities were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Navistar or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

62.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

63.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;
>
> (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Navistar; and
>
> (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

65.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

66.    The market for Navistar's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, Navistar's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Navistar's securities relying upon the integrity of the market price of Navistar's securities and market information relating to Navistar, and have been damaged thereby.

67.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Navistar's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

68.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Navistar's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Navistar and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the

Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

69.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

70.    During the Class Period, Plaintiff and the Class purchased Navistar's securities at artificially inflated prices and were damaged thereby.    The price of Navistar's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

71.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.    As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Navistar, their control over, and/or receipt and/or modification of Navistar's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Navistar, participated in the fraudulent scheme alleged herein.

72.    Throughout the Class Period, the defendants took advantage of the artificially inflated price of the Company's securities in completing numerous financing activities.    For

example, on March 12, 2003, the Company raised $190 million by selling senior convertible notes to investors.  Then on May 26, 2004, the Company raised an additional $250 million by selling additional convertible notes to investors.  Further, on February 23, 2005, the Company raised another $250 million by selling senior notes to investors in a private offering, and an additional $400 million on the same day by selling 6.25% senior notes to other investors.

**Applicability of Presumption of Reliance:**
**<u>Fraud On The Market Doctrine</u>**

73.    At all relevant times, the market for Navistar's securities was an efficient market for the following reasons, among others:

> (a)    Navistar's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

> (b)    As a regulated issuer, Navistar filed periodic public reports with the SEC and the NYSE;

> (c)    Navistar regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> (d)    Navistar was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

74.    As a result of the foregoing, the market for Navistar's securities promptly digested

current information regarding Navistar from all publicly-available sources and reflected such information in the price of Navistar's securities. Under these circumstances, all purchasers of Navistar's securities during the Class Period suffered similar injury through their purchase of Navistar's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

75.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Navistar who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

76.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

44

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Navistar's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

78.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Navistar's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

79.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Navistar's financial well-being, business relationships, and prospects, as specified herein.

80.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Navistar's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Navistar and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of Navistar's securities during the Class Period.

81.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

82.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Navistar's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions

alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

83.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Navistar's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Navistar's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Navistar's securities during the Class Period at artificially high prices and were damaged thereby.

84.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Navistar was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Navistar securities, or if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

85.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

87.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.    The Individual Defendants acted as controlling persons of Navistar within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

90.    As set forth above, Navistar and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

  **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

    (a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    (b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    (c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    (d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  January 7, 2007      Respectfully submitted,


       By: */s/  Marvin A. Miller*
         Marvin A. Miller
         Lori A. Fanning
         **MILLER LAW LLC**
         115 S. LaSalle Street
         Suite 2910
         Chicago, IL 60603
         (312) 334-3400
         (312) 676-2676 (Fax)

         ***Designated Local Counsel***

Richard A. Maniskas
D. Seamus Kaskela
**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

***Attorneys for Plaintiff***

## CERTIFICATION

I, Kevin Memoli, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint, and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's purchase and sale transaction(s) in the Navistar International Corp. (NYSE: NAV) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common stock | 100 | (B) | | 12/29/03 | $48.68 |
| Common Stock | 900 | (B) | | 12/29/03 | $48.67 |
| Common Stock | 1000 | | (S) | 12/31/03 | $48.66 |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25 day of December, 2007

_Kevin Memoli_
**KEVIN MEMOLI**